## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

CHARLES HAMMOND, JR., PH.D., )  Case No.:
           )
   Plaintiff,     )  **CLASS ACTION COMPLAINT**
           )
vs.         )  **JURY DEMANDED**
           )
BLUECROSS BLUESHIELD OF  )
TENNESSEE, INC.; BLUE CROSS )
BLUE SHIELD ASSOCIATION; STATE )
OF TENNESSEE COMPREHENSIVE )
MEDICAL AND HOSPITALIZATION )
PROGRAM; TENNESSEE STATE  )
INSURANCE COMMITTEE; STATE OF )
TENNESSEE BENEFITS   )
ADMINISTRATION DIVISION OF THE )
DEPARTMENT OF FINANCE  )
           )
Defendants,     )

## COMPLAINT

Plaintiff Charles Hammond, Jr., Ph.D. ("Plaintiff"), individually and on behalf of all others similarly situated, by and through the undersigned attorneys, alleges the following:

### I.  PRELIMINARY STATEMENT

1.  This case involves the categorical and systematic denial of coverage and benefits for medically and clinically necessary services or supplies.

2.  Defendant BlueCross BlueShield of Tennessee, Inc. ("BCBST"), in a medical policy that is outside the terms of any subscriber's health insurance policy, has unilaterally and in violation of its own guidelines for issuing medical policies, determined that "lumbar or thoracic artificial intervertebral disc implantation for the treatment of degenerative disc disease, radicular pain and myelopathy is considered investigational" despite that Lumbar Artificial Intervertebral Disc Replacement ("LADR")  has been approved as a safe and effective procedure for treating

lumbar disc disease, including degenerative disc disease, for over fifteen years by the United States Food and Drug Administration ("FDA").

3.     Because this overarching medical policy is outside the terms of any health insurance policy issued or administered by BCBST, it applies to every health insurance policy issued or sold by BCBST and was used to categorically deny all claims for LADR coverage or benefits. Thus, whether the policy is for individual, family, or group insurance and regardless of whether or not the policy is governed by ERISA, BCBST has breached its contracts to subscribers to provide coverage or benefits for medically or clinically necessary services or supplies that are determined by a physician to be essential to health.

4.     Were it not for the Defendants' creation of the outside medical policy, Plaintiff and Class Members would have received coverage or benefits for LADR surgery from Defendant pursuant to the terms of their respective contracts or policies. Instead, Plaintiff and members of the Class have been forced to either pay for the surgery out of pocket, continue with unnecessary and unhelpful physical therapy or other attempts at pain management, spinal injections, medications, or have undergone a less effective surgical option, lumbar disc fusion.

5.     Consequently, and as discussed in more detail below, BCBST's unsupported and incorrect determination that LADR is investigational is in breach of every contract for insurance issued by BCBST.

## II.     JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d) as minimal diversity exists and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

7.     Venue is proper in this district because the State Defendants reside in this district, Defendants may be found in this District and have sufficient contacts within this district to be subject to the personal jurisdiction of this Court, a substantial part of the events giving rise to the claim occurred in this district and/or because Plaintiff resides within this district, and pursuant to 28 U.S.C. § 1391(b).

### III.     PARTIES

**A.     Plaintiff**

8.     Plaintiff Charles Hammond, Jr., Ph.D., resides in Weakley County, Tennessee. Plaintiff Hammond is employed by the University of Tennessee at Martin ("UTM") and receives health insurance benefits through his employer. Full-time employees at UTM are eligible to enroll in benefits through the State of Tennessee's self-funded government plan, which includes state employees, higher education employees, local education employees, and local government employees.

9.     Eligible employees select coverage from either BlueCross BlueShield of Tennessee or Cigna. Plaintiff is and was at all times relevant herein, covered pursuant to a policy issued and administered by BlueCross BlueShield of Tennessee, Inc.

**B.     Defendants**

10.     Defendant BCBST, the claims administrator for Plaintiff's benefit plan at all times relevant herein, has its principal place of business located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402-9815.

11.     Defendant BCBST is in the business of insuring and/or administering group, individual, and family health plans, both fully-insured and self-funded. Some of these plans are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §

1001, *et seq*, but not all. For example, ERISA only applies to employee benefit plans established by an employer or an employee organization and exempts governmental and church plans. 29 U.S.C. § 1003. Plaintiff's benefit plan is a governmental plan and is, therefore, exempt from ERISA.

12.     As part of its duties as claims administrator, Defendant BCBST makes eligibility and coverage determinations for covered participants. By creating a medical policy outside of the terms of any contract for insurance coverage or benefits that directly affects the terms of a plan, Defendant BCBST has further entangled itself to the point of exercising discretionary authority or control over the management of a plan and in plan administration.

13.     Defendant Blue Cross Blue Shield Association ("BCBSA" or the "Association") is a corporation organized in the State of Illinois and headquartered at 225 N. Michigan Avenue, Chicago, Illinois 60601. It is owned and controlled by 38 health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names ("Blue Plans"). BCBSA, created by the Blue Plans, licenses the use of the names and marks, provides no health insurance directly to subscribers, and dictates certain terms and guidelines to the individual Blue Plans. Despite that it does not provide health insurance directly to any subscribers, BCBSA has created its own Medical Policy Reference Manual, cited to by Defendant BCBST, as a reason for denying coverage or benefits and declaring LADR surgery investigational.

14.     Defendant State of Tennessee Comprehensive Medical and Hospitalization Program (the "Plan") is a governmental employee benefits program established pursuant to Chapter 27 of Title 8 of the Tennessee Code Annotated and can be found at 19th Floor, 312 Rosa L. Parks Avenue, William R. Snodgrass Tennessee Tower, Nashville, Tennessee 37243-1102.

15. Defendant Tennessee State Insurance Committee ("Insurance Committee") is tasked under statute with "authority to enter into contracts with insurance companies, claims administrators and other organizations for some or all of the insurance benefits or services, including actuarial and consulting advice, necessary to administer the plans" and to "promulgate rules and regulations for the purpose of administering the group insurance plan for state officials and employees." Per the Plan, the Insurance Committee is the "plan administrator" of the Plan with responsibility for the administration of the plan, including interpretation of the plan and the amount, manner, and time of payment of benefits under the Plan. The Insurance Committee can be found at 312 Rosa L. Parks Ave, Nashville, Tennessee 37243.

16. Defendant State of Tennessee, Benefits Administration ("Benefits Administration") is a division of the Department of Finance and Administration and, according to the Plan, "shall mean the staff of the State Insurance Committee." Defendant Benefits Administration is tasked with responsibility for administrative functions necessary for administering the plan and "may be designated as the committee's representative." Defendant Benefits Administration is located at 19th Floor, 312 Rosa L. Parks Avenue, William R. Snodgrass Tennessee Tower, Nashville, Tennessee 37243-1102.

17. The Plan requires fiduciaries of the Plan who are "allocated specific duties or responsibilities under the plan" or "assumes such a position with the plan" to "discharge his/her duties solely in the interest of covered persons and for the exclusive benefit purpose of providing the benefits provided for in the plan to such covered persons … ." Both the Insurance Committee and Benefits Administration are fiduciaries of the Plan along with BCBST.

5

## IV.   CLASS ACTION ALLEGATIONS

18.   **Class Definition.** Plaintiff brings this action as a class action pursuant to Rules

23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the

following class of persons similarly situated (the "Class"):

> All participants and/or covered persons in or covered by any health
> insurance plan, program, or policy provided or administered by
> BCBST that were denied or will be denied coverage or benefits for
> Lumbar Artificial Intervertebral Disc Replacement ("LADR") for
> the treatment of degenerative disc disease, radicular pain, and/or
> myelopathy because BCBST determined the device and/or
> procedure was considered investigational and excluded from
> coverage.

19.   Within this broad Class, Plaintiff also seeks to represent a sub-class of persons

eligible for and receiving coverage and/or benefits under the Plan. Specifically, Plaintiff seeks

certification of the following sub-class of persons similarly situated (the "Sub-Class"):

> All participants and/or covered persons in or covered by the State
> of Tennessee Comprehensive Medical and Hospitalization
> Program administered by BCBST that were denied or will be
> denied coverage or benefits for Lumbar Artificial Intervertebral
> Disc Replacement ("LADR") for the treatment of degenerative
> disc disease, radicular pain, and/or myelopathy because BCBST
> determined the device and/or procedure was considered
> investigational and excluded from coverage.

20.   **Numerosity.** The Class and Sub-Class are large in number; the exact number and

identities of all Class and Sub-Class members are currently unknown to Plaintiff but are known

to Defendants.

21.   **Commonality.** There are questions of law or fact common to all members of the

Class and Sub-Class that concern Defendants' actions. Resolution of these questions will not

require individual inquiry into the actions or circumstances of individual Class and Sub-Class

members because the outside medical policy's existence means all Class members were denied

coverage on the same grounds. These common questions of law or fact revolve around whether

6

or not the Defendants can create a document outside the terms of the contract for coverage or benefits that systematically permits it to deny what would otherwise be covered services. Other common questions of law of fact involve whether the outside medical policy is in violation of the Defendants' duty of good faith and fair dealing because it is unsupported and violates the Defendants' own guidelines for investigational or experimental determination; whether the use of outside medical policy to systematically deny an otherwise covered procedure is in breach of Class members' contracts; and whether the Defendants knowingly and purposefully created the outside medical policy in order to wrongfully and fraudulently deny benefits for what would otherwise be a covered procedure.

22.     **Typicality.** Plaintiff is a member of the Class and Sub-Class as defined above. He has been harmed in a similar manner as all other Class members by the Defendants' actions and asserts the same claims and legal theories that all other Class members possess.

23.     **Adequacy.** Plaintiff will fairly and adequately protect the interests of the absent members of the Class and Sub-Class. Because his claims are typical of those of absent members of the Class and Sub-Class, Plaintiff has every incentive to vigorously pursue those claims on behalf of absent Class and Sub-Class members, and his interests coincide with, and are not antagonistic to, those of the Class or the Sub-Class. Moreover, Plaintiff is represented by counsel experienced in both ERISA and non-ERISA insurance benefit denials and complex class action litigation.

24.     **Rule 23(b)(1) Requirements**. The prosecution of separate actions by individual members of the Class and Sub-Class would create the risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants and a risk of

7

adjudications, which, as a practical matter, would be dispositive of the interests of other members of the Class and Sub-Class who are not parties.

25. **Rule 23(b)(2) Requirements**. Defendant has acted and/or refused to act and is likely to act and/or refuse to act on grounds generally applicable to the Class and Sub-Class, thereby making appropriate final injunctive and other relief with respect to the Class and Sub-Class as a whole.

## V.     FACTS

26. Individuals that receive health insurance coverage from BCBST, referred to herein as subscribers, pay premiums to BCBST in exchange for health insurance benefits as outlined in their policies. For some subscribers, their employers pay all or part of the premium for coverage on behalf of subscribers and for the exclusive benefit of subscribers. Others pay the premium for individual policies or for family coverage outside of any employer/employee relationship. In any case, premiums due for Plaintiff and Class members' policies have been paid and their contracts for coverage are or were valid at all times relevant herein.

27. Though subscribers' policies contain varying levels of coverage, copays, and deductibles, all provide some level of coverage or benefits for in-patient and out-patient surgery, that would otherwise have covered or provided benefits for LADR surgery.

28. The 2018 State Plan under which Plaintiff received medical benefits and which was the operative plan at the time Plaintiff was denied coverage, defines Medically Necessary or Clinically Necessary as "services or supplies, which are determined by a physician to be essential to health and are:

> (A) Provided for the diagnosis or care and treatment of a medical, mental health/substance use or surgical condition;
> (B) Appropriate and necessary for the symptoms, diagnosis or treatment of a medical condition;

8

(C) Within standards of medical practice recognized within the local medical community;

(D) Not primarily for the convenience of the covered person, nor the covered person's family, physician or another provider; and

(E) Performed in the most appropriate, cost effective and safe setting or manner appropriate to treat the covered person's medical condition. The fact that a physician has prescribed, performed, ordered, recommended or approved a service or treatment does not, in and of itself, make it medically necessary and appropriate. The claims administrator will determine if an expense is medically necessary and/or clinically necessary."

29. On its website, Defendant BCBST outlines when it will issue a Medial Policy and the determinations used to support those policies. That page, which describes the criteria for a medical policy can be found at: **https://www.bcbst.com/providers/coverage-policies-guidelines/index.page**. It proclaims that "Medical policies are based on evidence-based research aimed at determining the scientific merit of a particular medical technology."

30. Supposedly, when issuing a medical policy, Defendant BCBST uses the following criteria:

The technology must have final approval from the appropriate governmental regulatory bodies.

The scientific evidence must permit conclusions concerning the effect of the technology on health outcomes.

The technology must improve the net health outcome.

The technology must be as beneficial as any established alternatives.

The improvement must be attainable outside the investigational settings

31. Despite LADR meeting the above requirements and having been safely and effectively in use for at least 15 years, BCBST, following the lead of the Association, created a medical policy declaring the procedure to be investigational. The result is a systemic and categorical denial of what would otherwise be covered services under Plaintiff and Class members' insurance contracts or policies.

9

32.     In support of its medical policy, BCBST cites to the BCBSA Medical Policy Reference Manual entitled "*Artificial intervertebral disc: lumbar spine* (7.01.87)." This document, which is not publicly available, was retrieved by BCBST from the "BlueWeb." BlueWeb is a trademark of the BCBSA and is used for the transmission and sharing of documents between the Association and the Blue Plans.

33.     BCBSA, which does not directly issue insurance to subscribers, should have no need for a Medical Policy Reference Manual or to make any determinations regarding whether certain services or procedures are experimental or investigational were those policies not intended to directly impact or require the separate Blue Plans' coverage or benefit determination decisions.

34.     Upon information and belief, the BCBSA medical policy is the major driving factor behind BCBST's medical policy determination that LADR is investigational. Absent the BCBSA medical policy, BCBST would not have declared LADR to be investigational.

**A.     LADR**

35.     Spinal fusion was the standard treatment for degenerative disc disease, but it came with certain drawbacks like decreased mobility at the fused level, which led to increased stress on the adjacent vertebral bodies. This increased stress meant an increased risk of herniation or other disc disease surrounding the fused level.

36.     As an alternative, the entire degenerative disc can now be replaced with an artificial one, maintaining the proper spacing and without interfering with the natural flexion of either the affected disc or the adjacent discs. The benefit from disc replacement is there is no limitation on flexibility and mobility as occurs from a fusion.

37.     The first Lumbar Artificial Disc filed for Pre-Market Approval ("PMA") in

February 2004. The device, the Charite artificial disc, was reviewed in a June 2004 Panel,

wherein the panelists recommended approval of the device.  Final approval was granted October

26, 2004.

38.     The FDA-approved indications for use in 2004 were:

> The CHARITE Artificial Disc is indicated for spinal arthroplasty
> in skeletally mature patients with degenerative disc disease (DDD)
> at one level from L4-S1. DDD is defined as discogenic back pain
> with degeneration of the disc confirmed by patient history and
> radiographic studies. These DDD patients should have no more
> than 3mm of spondylolisthesis at the involved level. Patients
> receiving the CHARITE Artificial Disc should have failed at least
> six months of conservative treatment prior to implantation of the
> CHARITE Artificial Disc.

39.     In its approval, the FDA also recognized that the device had been available in

other countries since 1987.

40.     A second artificial disc, the ProDisc-L received FDA approval in August of 2006.

That approval states:

> This device is indicated for spinal arthroplasty in skeletally mature
> patients with degenerative disc disease (DDD) at one level from
> L3-S1. DDD is defined as disco genic back pain with degeneration
> of the disc confirmed by patient history and radiographic studies.
> These DDD patients should have no more than Grade 1
> spondylolisthesis at the involved level. Patients receiving the
> PRODISC®-L Total Disc Replacement should have failed at least
> six months of conservative treatment prior to implantation of the
> PRO DISC@-L Total Disc Replacement.

41.     The third FDA-approved device for LADR is the ActiveL device, which was

approved on June 11, 2015.  Similarly, the approval for the ActiveL states:

> This device is indicated for reconstruction of the disc at one level
> (L4-L5 or L5-S1) following single-level discectomy in skeletally
> mature patients with symptomatic degenerative disc disease
> (DDD) with no more than Grade I spondylolisthesis at the involved

11

> level. DDD is defined as discogenic back pain with degeneration of the disc confirmed by patient history, physical examination, and radiographic studies. The activL® Artificial Disc is implanted using an anterior retroperitoneal approach. Patients receiving the activL® Artificial Disc should have failed at least six months of nonoperative treatment prior to implantation of the device.

42. Interestingly, two of these approvals predate the first FDA-approved artificial cervical disc, which occurred in July 2007. Yet, BCBST's medical policy states that cervical artificial intervertebral disc implantation is "medically appropriate" if it meets certain diagnostic criteria, but lumbar disc replacement is categorically deemed investigational.

43. Between the three devices, and since the first approval in 2004, LADR has been successfully performed thousands of times and has been proven safe and effective in the treatment of degenerative disc disease in the lumbar region of the spine.

44. PMA is the FDA process of "scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices." It is the most stringent device application required by the FDA.

45. Class III medical devices are those that could present significant risks to human health if not properly vetted prior to approval. The PMA process is a four-step review that consists of an initial filing review, and in-depth scientific, regulatory and quality system review by appropriate FDA personnel (called a substantive review), a panel review requiring a recommendation for approval, and final deliberations, documentation, and notification by the FDA to the PMA filer. Once the PMA process is complete, and if approved, the device is considered safe and effective for the indicated purposes for which the FDA issued an approval.

46. In order for a device to receive FDA approval through the PMA process, the application must contain "sufficient valid scientific evidence to assure that the device is safe and

effective for its intended use(s)." This includes the filer demonstrate safety and efficacy through, among other things, clinical trial evidence.

47.     All of the above-mentioned devices were required to seek approval through this most stringent process, and all succeeded, proving their safety and efficacy.

48.     Not only have the FDA-approved LADR devices demonstrated to the FDA through clinical trials that they are safe and effective, but LADR is widely accepted in the medical community throughout the country and the world as a safe and effective treatment for degenerative disc disease and as a viable alternative to spinal fusion. Indeed, the North American Spine Society ("NASS") endorses the procedure and recognized LADR may reduce the risk of increased wear and tear on the neighboring discs and a potential faster recovery time.

49.     Further, the American Association of Neurological Surgeons, Congress of Neurological Surgeons, and their combined Joint Section on Disorders of the Spin and Peripheral Nerves wrote to the NASS in 2018 in support of broadening the NASS-then-in-place "coverage recommendations" regarding LADR, indicating their full support of the procedure, generally.

50.     Those societies' only real disagreement with the coverage recommendation by the NASS was to remove the proposed requirement of modic changes; those patients would also be candidates for the surgery in the broader definition proposed by the three societies.

51.     Several other major carriers of health insurance provide coverage for LADR finding, for example, that LADR with an FDA-approved disc is "proven and medically necessary for treating single level lumbar Degenerative Disc Disease" provided certain criteria are met and the absence of contraindications.

**B. Defendant BCBST's Systemic and Categorical Denial of all LADR Claims**

52. BCBST, instead of following the recommendations of several national medical associations and the FDA, unilaterally determined to systematically and categorically deny all coverage and benefits for LADR.

53. The medical policy, entitled "Artificial Intervertebral Disc" simply states that all "Lumbar or thoracic artificial intervertebral disc implantation for the treatment of degenerative disc disease, radicular pain and myelopathy is considered *investigational*."

54. BCBST has used this "investigational" determination to systematically and categorically deny all requests for coverage or benefits for LADR, citing to the policy definition of "medically necessary" and the exclusions provision contained in all BCBST policies.

**C. Defendant BCBST's Denial of Plaintiff's LADR Request**

55. Plaintiff is and was at all times relevant herein, covered by a contract or policy for coverage or benefits, named the State of Tennessee Comprehensive Medical and Hospitalization Program (the "Plan"), that was administered by Defendant BCBST.

56. The terms of that Plan, like all Plans, contains specific provisions for inpatient and outpatient hospital coverages, including surgery.  Specifically, Plaintiff's plan states:[1]

|  | In-Network | Out-of-Network [1] |
| --- | --- | --- |
| **HOSPITAL/FACILITY SERVICES (includes professional and facility charges)** | | |

---

[1] Note 1 in the Plan provides: Subject to maximum allowable charge (MAC). The MAC is the most that the plan will pay for a service from an in-network provider.  For non-emergent care from an out-of-network provider who charges more than the MAC, members will pay any applicable copay or coinsurance amount PLUS the difference between the MAC and the actual charge. For out-of-network emergency services and ambulance services, members will not be responsible for amounts exceeding the allowable (maximum amount eligible for payment) unless the claims administrator determines the situation was not an emergency or not medically necessary.

| | | |
|---|---|---|
| • Inpatient care [4]<br>• Outpatient surgery [4]<br>• Inpatient behavioral health and substance use [2][4] | 10% coinsurance | 40% coinsuranc e |

57.     Plaintiff, after multiple attempts at less invasive treatments such as spinal injections and topical pain medication, was advised he was a candidate for disc replacement by one of his treating physicians. He was then referred to a physician in Texas for a surgical consultation by a well-known and board-certified orthopedic surgeon. Plaintiff was informed he met the criteria for surgery at the L5-S1 juncture.

58.     In May 2018, Plaintiff's provider representative attempted to verify coverage and/or benefits for a LADR procedure (22857) on behalf of Plaintiff. The provider representative was informed by a representative of Defendant BCBST that the procedure was considered investigational and would be denied.

59.     The Texas surgeon then informed Plaintiff that despite BlueCross BlueShield of Texas providing coverage for LADR, BCBST did not cover the surgery.

60.     Upon requesting justification from BCBST for the denial, Plaintiff was provided a copy of the medical policy that is outside of his contract/policy for coverage or benefits. At that time, Plaintiff requested a review of the denial through the grievance procedures at BCBST and exhausted any and all administrative review and/or remedies as required under his contract.

61.     As part of that review, BCBST claimed to have utilized an outside consultant to review Plaintiff's case. That consultant, though, appears to have done no investigation further than referring to BCBST's outside medical policy that declares, without support and in violation of Plaintiff's contract, that LADR is investigational. In other words, neither BCBST nor its hired consultant actually reviewed medical literature, national medical organization recommendations, nor FDA approval status in determining LADR is excluded as investigational.

62.     With increasing back pain and no other viable treatment recommended to him, Plaintiff paid out-of-pocket for the surgery, which was completed December 18, 2018.

63.     The 2018 State Plan, which was the operative plan at the time of Plaintiff's request for surgery, like most insurance policies, contains an exclusions and limitations provision with the following restriction: Experimental/investigational medical or surgical procedures and prescription drugs as initially determined by the claims administrator to not yet be recognized as acceptable medical practice or which require, but have not received, approval by a federal or other governmental agency.[2]

64.     This exclusionary language would give no subscriber an indication that some outside medical policy could affect coverage determinations.

65.     Further, the language, if read alone, would not exclude coverage or benefits for LADR. The provision fails to include sufficiently specific discretionary authority to the claims administrator to determine whether a procedure is investigational. Indeed, the language of the clause itself would dictate LADR is not investigational.

66.     Specifically, the exclusion requires the claims administrator to "initially determine[]" a procedure "to not yet be recognized as acceptable medical practice *or* which require, but have not yet received, approval by a federal or other governmental agency." (emphasis added).

---

[2] It cannot be ignored that BCBST has apparently changed the language of its Exclusion and Limitations provision for experimental/investigational surgical procedures, likely recognizing that its own medical policies fail to satisfy the policy language. The 2019 exclusion now reads: Medical or surgical procedures and prescription drugs determined by the claims administrator to be experimental, investigational, or unproven. There is no longer any limiting language requiring an excluded procedure to be either not medically acceptable or unapproved. This change in language has no effect on Plaintiff's claims or those of the Class because Plaintiff and Class object to the use of the outside medical policy to prevent safe and effective treatments that would otherwise be covered under their contracts/policies.

67.     As discussed above, multiple national medical organizations that specialize in surgeries of the spine support LADR and there are multiple LADR devices that have sought and been approved by the FDA for use in LADR surgery. Thus, under either section – the exclusionary clause uses a disjunctive conjunction indicating only one must be satisfied as opposed to both – LADR would not be excluded as experimental/investigational as it is defined within the terms of the policy contract. In other words, if a surgical procedure is "acceptable as medical practice," it is not experimental/investigational under the policy. Alternatively, if a surgical procedure requires and has received "approval by a federal or other governmental agency," it is likewise not excluded as experimental/investigational.

68.     In this case, LADR is both acceptable as medical practice ***and*** approved by the federal, governmental agency tasked with determining the safety and effectiveness of surgical devices, the FDA, and has satisfied both possibilities of potential exclusion.

69.     Under the plain language of the contract, then, LADR does not meet the definition within the experimental/investigational exclusion and should have been approved.

## VI.     CLAIMS FOR RELIEF

### CLAIM I – BREACH OF CONTRACT
### (Brought on Behalf of the Class Against BCBST and the Sub-Class Against
### the Insurance Committee, Benefits Administration, and BCBST)

70.     The Plaintiff and the Class repeat and reallege the preceding paragraphs as if fully set forth herein.

71.     Plaintiff and the Class were at all times relevant herein, provided insurance coverage or benefits pursuant to a valid contract issued and/or administered by Defendants.

72.     No contract, policy, or plan issued or administered by BCBST contains within the contract any exclusion for LADR surgery.

73. By referring to a medical policy outside the terms of those valid contracts, Defendant BCBST categorically denied coverage for all requests for inpatient and/or outpatient hospital and/or surgical benefits related to or arising from LADR surgery.

74. The terms of Plaintiff's Plan and Class members' policies, contracts, or plans would not support the denial of LADR surgery as investigational.

75. BCBST, thus, breached its contract to Plaintiff and the Class for providing hospital, surgical, and/or other coverage or benefits for what would otherwise be considered a medically necessary and appropriate treatment.

76. The Defendants' actions have resulted in additional expense to Class members including co-pays and/or co-insurance payments for unnecessary physical therapy, pain management and prescriptions, spinal injections, and other office visits; resorting to less preferred surgeries, such as spinal fusion and the costs associated with that surgery; and attorney fees and costs.

77. Defendant BCBST created the outside medical policy with the intent to deny what it knew to be otherwise covered services and surgeries. These systematic denials were made with reckless disregard for the ongoing pain, expense, and physical limitations suffered by Plaintiff and members of the Class resulting from denial of LADR surgery.

78. Defendant BCBST acted intentionally, fraudulently, maliciously, and recklessly by creating the outside medical policy with the intent to deny what it knew to be otherwise covered services and surgeries.

**CLAIM II – BREACH OF FIDUCIARY DUTY**
**(Brought on Behalf of the Class Against BCBST and the Sub-Class Against the Plan,**
**the Insurance Committee, Benefits Administration, and BCBST)**

79.     The Plaintiff and the Class repeat and reallege the preceding paragraphs as if fully set forth herein.

80.     According to the Plan, Defendants owed fiduciary duties of loyalty and prudence to Plaintiff and Class members and were required to exercise those duties "solely in the interest of covered persons and for the exclusive benefit purpose of providing the benefits provided for in the plan to such covered persons."

81.     Defendants have violated those duties and have failed to act with the care, skill, prudence and diligence required of fiduciaries when interpreting the plan documents, when making coverage decisions, and when adopting and/or allowing the use of the outside medical policy.

82.     Plaintiff and Class members have been harmed by these breaches of fiduciary duty by causing them additional expense including co-pays and/or co-insurance payments for unnecessary physical therapy, pain management and prescriptions, spinal injections, and other office visits; resorting to less preferred surgeries, such as spinal fusion and the costs associated with that surgery; and attorney fees and costs.

## VII.     PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays this Court enter judgment as follows:

A.     Certifying this action as a class action on behalf of both the Class and the Sub-Class;

B.     An Order for affirmative injunctive relief requiring Defendants to withdraw or otherwise remove the outside medical policy declaring LADR as investigational;

C.	An Order requiring BCBST to reimburse and/or process payment to providers on all previously denied requests for coverage or benefits relating to or arising from LADR surgery;

D.	An award of punitive damages and/or additional compensation against BCBST in an amount to be determined by the finder of fact, as permitted by law;

E.	An award of actual damages against BCBST;

F.	Awarding Plaintiff:

a.	His costs, disbursements and expenses herein; and

b.	Reasonable attorneys' fees;

G.	Awarding the Class and Sub-Class such other and further relief as the Court may deem just, proper, and equitable; and

H.	Plaintiff, on behalf of the Class and Sub-Class, further demands a jury to hear his case.

Respectfully submitted,

/s/ Hudson T. Ellis
Hudson T. Ellis
Eric Buchanan
Audrey Dolmovich
Eric Buchanan & Associates PLLC
414 McCallie Avenue
Chattanooga, TN 37402
T: 877.634.2506
F: 423.634.2505
ebuchanan@buchanandisability.com
hellis@buchanandisability.com
adolmovich@buchanandisability.com

Thomas O. Sinclair
Lee P. Fernon, Jr.
*Motions for admission pro hac vice to be filed*
Sinclair Law Firm, LLC
2000 SouthBridge Pkwy, Suite 601

Birmingham, AL 35209
T: 205.868.0818
F: 205.868.0894
tsinclair@sinclairlawfirm.com
lfernon@sinclairlawfirm.com

Patrick J. Sheehan
WhatleyKallas
*Motions for admission pro hac vice to be filed*
101 Federal Street, 19th Floor
Boston, MA 02110
T: 205.488.1200
F: 800.922.4851
psheehan@whatleykallas.com

**ATTORNEYS FOR PLAINTIFF**